NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11536


SCHOOL COMMITTEE OF LEXINGTON  vs.  MARK ZAGAESKI.



Middlesex.      March 4, 2014. - July 14, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Duffly, &
Lenk, JJ.



Arbitration, Judicial review, Authority of arbitrator, Award,
     School committee.  Education Reform Act.  Statute,
     Construction. School and School Committee, Arbitration,
     Termination of employment.  Public Employment, Termination.



     Civil action commenced in the Superior Court Department on
April 27, 2012.

     Motions to vacate and to affirm an arbitration award were
heard by Bruce R. Henry, J.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Geoffrey R. Bok (Colby C. Brunt with him) for the
plaintiff.
     Daniel S. O'Connor (Laura Elkayam with him) for the
defendant.
     Stephen J. Finnegan & Michael J. Long, for Massachusetts
Association of School Commitees, Inc. & another, amici curiae,
submitted a brief.

Ira Fader for Massachusetts Teachers Association, amicus curiae, submitted a brief.

SPINA, J.  In this case, the plaintiff, the school committee of Lexington (school committee), appealed a decision by a Superior Court judge confirming an arbitrator's award reinstating a teacher, Mark Zagaeski, after the school district superintendent had terminated his employment for conduct unbecoming a teacher.  We granted the plaintiff's application for direct appellate review.  This case presents an issue left unresolved by this court in School Dist. of Beverly v. Geller, 435 Mass. 223 (2001).  We must determine the scope of authority granted to an arbitrator by G. L. c. 71, § 42 (teacher dismissal statute), to reinstate a teacher who was dismissed for conduct that the arbitrator found constituted, at least nominally, a valid basis for dismissal.[1]

We conclude that in light of the stated purposes of the Massachusetts Education Reform Act of 1993 (Reform Act or Act), of which the teacher dismissal statute is a part, the arbitrator exceeded the scope of his authority by awarding reinstatement of Zagaeski on the basis of the "best interests of the pupils" in

_____

[1] General Laws c. 71, § 42 (teacher dismissal statute), provides in part that a teacher who has served in a school district for at least three consecutive school years may not be dismissed except for "inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to [G. L. c. 71, § 38,] or other just cause."

the district, despite having found that the school district carried its burden to show facts amounting to conduct unbecoming a teacher.  See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27; G. L. c. 71, § 42.  We reverse the decision of the Superior Court judge and vacate the arbitration award.[2]

1.  Background.  a.  Facts.[3]  Zagaeski's dismissal from his position at the Lexington public schools arose from a series of incidents that took place prior to the spring of 2011.[4]  By that time, Zagaeski had been employed by the Lexington school district (school district) since 2000 as a physics teacher.[5]

---

[2] We acknowledge the amicus brief filed by the Massachusetts Teachers Association in support of Zagaeski and the amicus brief filed by the Massachusetts Association of School Committees, Inc., and the Massachusetts Association of School Superintendents in support of the Lexington School Committee.

[3] A reviewing court is bound by the facts found by the arbitrator.  School Comm. of Lowell v. Robishaw, 456 Mass. 653, 660-661 (2010).  Accordingly, we summarize the facts leading up to Zagaeski's dismissal based on the facts found in the arbitrator's award.

[4] Zagaeski's dismissal was based on six separate instances of conduct that the school district found to constitute conduct unbecoming a teacher.  Because the arbitrator concluded that the school district had carried its burden to establish that only one of these incidents constituted, at least nominally, conduct unbecoming a teacher, we address only that incident.

[5] Zagaeski earned his doctorate in cellular biophysics in 1981.  Following postdoctoral work, he was employed as a teacher for six years at a private school.  He began working at Lexington High School in 2000.  He took a leave of absence from the fall of 2002 to the fall of 2004 to work in private industry.  He returned to Lexington High School in the fall of 2004 and worked there continuously until his termination in June, 2011.

Until 2011, Zagaeski's teaching evaluations had been uniformly positive, and he had never been disciplined by the district. He was commended by classroom observers for creating a classroom environment in which students felt comfortable asking questions and were engaged in the learning process.

At Lexington High School, Zagaeski taught an integrated math and physics class for students who tended to be at-risk academically and had struggled in math and science classes in the past. Many of these students also faced behavioral issues and some had been diagnosed with attention deficit disorder and other learning challenges. In order to engage this student population, Zagaeski developed a teaching style that was less hierarchical. He encouraged collaboration and a more relaxed classroom atmosphere. The arbitrator found that, as a result, "the students had a more familiar relationship with Dr. Zagaeski than they would have with a teacher following a more traditional teaching style" and that "[Zagaeski] was more flexible with boundaries than another teacher might have been." However, Zagaeski's nontraditional boundaries eventually caused problems.

In April, 2011, a seventeen year old female student in Zagaeski's class was disappointed with the grade she was then receiving and asked Zagaeski, in front of her classmates, whether there was any way she could "pay . . . for a better grade." A male student in the class asked, "You mean short of

sexual favors?" Rather than correcting the male student for making a comment encouraging the trade of sex for grades, Zagaeski chose to engage in the dialogue himself. "Yes, that is the only thing that would be accepted," he stated. Students in the classroom laughed, and Zagaeski continued by saying, "Don't be ridiculous" and told the female student that the only way to raise her grade would be better work. He then encouraged her to come after school for extra help if she had questions.

Two days later, the female student did go to Zagaeski's classroom after school for extra help. Zagaeski was in his classroom assisting a second female student in setting up equipment for laboratory work that she would be doing that afternoon. The first female student again asked Zagaeski, "[C]an't I just pay you for a better grade?" Zagaeski responded, "Well, no . . . you know that the only thing that I would accept is a sexual favor." The second female student exclaimed, "Dr. Z!" and laughed. However, the first female student made a complaint to her guidance counselor about Zagaeski's comments, which the arbitrator determined was a result of the student feeling troubled by the comments.

Following the student's complaint, the school principal commenced an investigation, which was then taken up by the central administration. Zagaeski was provided with written notice that an investigation had commenced into allegations of

sexual harassment against him, and he was placed on administrative leave. The assistant superintendent then interviewed a number of staff members and students. He also arranged for an investigative interview of Zagaeski, which was attended by the assistant superintendent, counsel for the school district, union counsel for Zagaeski, and the president of the teacher's union.

Following the interview, Zagaeski came to understand that the allegations against him were quite serious. He then wrote a letter to the assistant superintendent expressing remorse and an intent to improve his classroom approach. In the letter he admitted to "the weakness of an appropriate boundary between myself and my students" and the "need to create much clearer guidelines, not only for the students in my classroom, but for my own behavior towards students as well." He also stated, "Allowing . . . sexually inappropriate comments in the class to go unchallenged, and even to take part in that banter myself is completely out of line . . . ."

Subsequently, the district superintendent reviewed Zagaeski's letter and his personnel file and was briefed by the assistant superintendent regarding the investigative interview and other interviews that the assistant superintendent had conducted with students and staff. The superintendent thereafter provided Zagaeski with formal notice of the

district's intent to dismiss him from employment and of his right to meet with the superintendent to provide additional information on his own behalf.  Zagaeski requested such a meeting, which he attended with counsel.  Also present at the meeting were the superintendent and assistant superintendent, counsel for the school district, a representative from the Massachusetts Teachers Association and the president of the teacher's union.

Soon thereafter, the superintendent informed Zagaeski in writing that he was dismissed from his position.  The dismissal was based on six separate instances of conduct found to constitute conduct unbecoming a teacher.  The dismissal letter also stated that any one of the instances alone would have been sufficient to justify his dismissal.

b.  <u>Arbitration award</u>.  Pursuant to his rights under the teacher dismissal statute, Zagaeski timely filed an appeal from the school district's dismissal decision, which, as mandated by the statute, resulted in arbitration proceedings.  See G. L. c. 71, § 42, par. 4.  Based on undisputed evidence and Zagaeski's testimony at the arbitration hearing, the arbitrator concluded that the school district had carried its burden to establish only one of its six bases for dismissal of Zagaeski, specifically Zagaeski's admission that, "in response to a female student's inquiry as to whether she 'could just pay . . . for a

higher grade' [he] responded, "No.  The only thing I would accept is a sexual favor."

Regarding this conduct, the arbitrator found that although it was intended only as a joke, it rose to the level of sexual harassment as defined in the school committee's "Policy Prohibiting Harassment."[6]  The arbitrator further found that even though the comments by Zagaeski were not intended to be taken in earnest, objectively they were inappropriate comments for a teacher to make to a student.  Furthermore, the comments had the subjective effect of offending the student or making her sufficiently uncomfortable to lodge a complaint with her guidance counselor.  Therefore, the arbitrator found that these comments created a hostile or offensive educational environment for the female student.

Nevertheless, the arbitrator went on to find that this instance of sexual harassment was "relatively less egregious" and that the two comments regarding the trade of sex for grades,

---

[6] As reflected in the arbitrator's decision, the policy provides, in part:  "Harassment is defined as any communication or conduct that is sufficiently serious to limit or deny the ability of a student to participate in or benefit from the educational program . . . .  It includes . . . any communication . . . such as jokes . . . that offends or shows disrespect to others based upon . . . color [or] gender . . . ."  It further provides:  "While all types of harassment are prohibited, sexual harassment requires particular attention . . . .  In addition to the above examples, other sexually oriented conduct, whether it is intended or not, that is unwelcome and has the effect of creating . . . [an] educational environment that is hostile, offensive, intimidating or humiliating . . . may constitute sexual harassment . . . ."

separated by two days, could be viewed as "one isolated instance" of sexual harassment. Thus the arbitrator concluded that Zagaeski's conduct constituted a "relatively minor and isolated" violation of the harassment policy, which only "nominally" constituted conduct unbecoming a teacher. The arbitrator further found that in light of Zagaeski's strong performance throughout his employment, it would be in the best interests of the pupils in the district that he be retained as a teacher. Therefore, the arbitrator issued an award reinstating Zagaeski with full back pay, less two days of unpaid suspension, which was the most severe discipline for which the school district would have had "just cause," according to the arbitrator.

c. <u>Superior Court decision</u>. Following the issuance of the arbitration award, the school committee filed a complaint and application to vacate the arbitration award in the Superior Court on the bases that the arbitrator had exceeded his statutory authority in modifying the punishment imposed by the school district and that the arbitrator's award violated public policy. Zagaeski filed a counterclaim and application to confirm the award.

Under the teacher dismissal statute, judicial review of an arbitration award is limited to the grounds set forth in G. L. c. 150C, § 11. See G. L. c. 71, § 42, par. 6. One such ground

is if the arbitrator "exceeded [his or her] powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law." G. L. c. 150C, § 11 (a) (3). The Superior Court judge, referencing existing uncertainty in the case law surrounding the precise scope of an arbitrator's authority under the teacher dismissal statute to reduce or alter the disciplinary penalty imposed by a school district, concluded that the arbitrator had not exceeded his authority in issuing the award. The judge stated that although he was inclined to follow the reasoning of Justice Cordy's plurality opinion in Geller in support of a conclusion that the arbitrator had exceeded the scope of his authority, the judge was given pause by a footnote in the opinion, which states in relevant part, "This is not the case of an arbitrator finding a teacher to have engaged in minor misconduct that, however, nominally fit within a category on which dismissal could be based. In such circumstances, an arbitrator's finding that the conduct did not rise to the level of misconduct contemplated by the statute as a ground for dismissal is one that would likely lie within the scope of his authority." Geller, 435 Mass. at 231 n.7 (Cordy, J., concurring). Therefore, because the arbitrator's award in this case tracked precisely the footnote in Geller in concluding that Zagaeski's conduct only "nominally" constituted conduct unbecoming a teacher, the judge concluded

that the arbitrator's award was not in excess of his statutory authority.[7]

Consequently, the judge denied the school committee's motion to vacate the arbitration award and granted Zagaeski's application to confirm. The school committee appealed from the decision of the Superior Court and filed an application for

---

[7] The judge further concluded that the arbitration award did not constitute a violation of public policy. We have recognized that an arbitrator may exceed the scope of his or her authority in awarding reinstatement of an employee where the award violates public policy. See Atwater v. Commissioner of Educ., 460 Mass. 844, 848 (2011). The requirements for establishing that such an award is contrary to public policy are three-fold: (1) the conduct in issue violates a well-defined and dominant public policy set forth in statutory or judicial sources, (2) the conduct in issue is integral to the employee's duties, and (3) the award itself violates public policy because the employee's conduct is of the sort that requires dismissal. School Comm. of Lowell v. Robishaw, 456 Mass. 653, 664 (2010). Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 604-605 (2000). Because we conclude that the arbitrator exceeded the scope of his authority on other grounds, we need not reach this argument. However, we do acknowledge that there is a well-defined and dominant public policy prohibiting teacher-on-student sexual harassment and that Zagaeski's conduct, undertaken in the classroom setting, was integral to the performance of his employment duties. See G. L. c. 151C, § 2 (g) (sexual harassment of student is unfair educational practice); G. L. c. 214, § 1C (granting right to be free from sexual harassment in school); 603 Code Mass. Regs. § 26.07(2) (2012) (requiring public schools to strive to prevent sexual harassment and to respond promptly to reports of its occurrence). See also School Dist. of Beverly v. Geller, 435 Mass. 223, 238 (2001) (Ireland, J., concurring in the result), quoting Massachusetts Highway Dep't v. American Fed'n of State, County, and Mun. Employees, Council 93, 420 Mass. 13, 17 (1995) (teacher's repeated infliction of physical abuse on students in school was misconduct that "goes 'to the heart of a worker's responsibilities'"); Massachusetts Highway Dep't, supra.

direct appellate review.  We granted the school committee's application, and we reverse.

2.  Standard of review.  As a general matter, "a reviewing court is strictly bound by an arbitrator's factual findings and conclusions of law, even if they are in error."  School Comm. of Lowell v. Robishaw, 456 Mass. 653, 660 (2010), quoting School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753, 758-759 (2003) (Pittsfield).  This strict standard of review is highly deferential to the decision of an arbitrator, and it reflects a strong public policy in the Commonwealth in favor of arbitration.  Pittsfield, supra at 758.  See Geller, 435 Mass. at 228 (Cordy, J., concurring); Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 604 n.4 (2000), quoting Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 670 (11th Cir. 1988) ("An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish.  Yet it may not be subject to court interference").  Such strong public policy arises in part from a general recognition that arbitration has long served as an effective means of resolving labor disputes without resort to the courts.  Pittsfield, supra.  Therefore, in order to protect the efficiency that arbitration affords in resolving these disputes, the Legislature often strictly limits the circumstances in which a court may vacate an

arbitral award -- lest arbitration become merely an intermediate step between a dispute and litigation in court.  Id.

In the education context, the Reform Act replaced de novo review of teacher dismissal decisions by the Superior Court with mandatory arbitration in order to "depoliticize[] and streamline[]" the teacher dismissal process.  See Geller, 435 Mass. at 225 n.1 (Cordy, J., concurring); 1992 House Doc. No. 5750, at 2 (letter from Governor William Weld accompanying first draft of Reform Act).  Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6.  The Reform Act provided for limited judicial review of arbitration awards by reference to G. L. c. 150C, § 11.  See St. 1993, c. 71, § 44.  However, a reviewing court must vacate an arbitration award under the circumstances set forth in G. L. c. 150C, § 11 (a), including if the arbitrator exceeded his or her authority in granting the award.  G. L. c. 150C, § 11 (a) (3).  School Comm. of Lowell v. Vong Oung, 72 Mass. App. Ct. 698, 704 (2008), quoting Board of Higher Educ. v. Massachusetts Teachers Ass'n, NEA, 62 Mass. App. Ct. 42, 47 (2004) (under teacher dismissal statute, "[t]he question whether an arbitrator exceeded his or her authority is always subject to judicial review").

Ordinarily, where arbitration is mandated by the terms of a collective bargaining agreement, the scope and limits of the

authority of the arbitrator are ascertained by reference to the terms of the agreement. School Comm. of Chicopee v. Chicopee Educ. Ass'n, 80 Mass. App. Ct. 357, 364 (2011) (Chicopee). Indeed, judicial deference to arbitrators' awards stems in part from a recognition that the parties bargained for and agreed that an arbitrator would serve as a neutral third party in interpreting the written agreement between the parties, whether it be a commercial contract or a collective bargaining agreement. Geller, 435 Mass. at 229-230 (Cordy, J., concurring). In such circumstance, an arbitrator may be uniquely qualified to interpret the "law of the shop." Id. However, in a case such as this, where arbitration is mandated by statute, the exclusive source of the arbitrator's authority is the statute itself. G. L. c. 71, § 42. Chicopee, supra at 365 (observing that in Geller, both Justice Cordy's concurrence and Justice Cowin's dissent agreed with this proposition). See Geller, 435 Mass. at 230 n.5 (Cordy, J., concurring). Id. at 240 (Cowin, J., dissenting). Consequently, courts are as well, if not better, positioned to interpret the "law of the land" in the form of the statutes of the Commonwealth. Geller, supra 229-230 (Cordy, J., concurring), and cases cited. Therefore, judicial review of the arbitrator's interpretation of the authorizing statute, particularly regarding the scope of the arbitrator's authority under the statute, is "broader and less

deferential" than in cases of judicial review of an arbitrator's decision arising from the interpretation of a private agreement. Atwater v. Commissioner of Educ., 460 Mass. 844, 856-857 (2011), citing Geller, supra at 229 (Cordy, J., concurring).

We conclude that in light of the stated purposes of the Reform Act, of which the teacher dismissal statute is a part, combined with the specific language of the teacher dismissal statute itself, the arbitrator exceeded the scope of his authority by awarding reinstatement of Zagaeski.  See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27; G. L. c. 71, § 42, pars. 5-6.

3.  Statutory scheme.  The statutory scheme governing teacher dismissals set forth in G. L. c. 71, § 42, was enacted as part of the Reform Act, which brought broad-based changes to the funding and governance structure of the public education system in Massachusetts.  Geller, 435 Mass. at 225 n.1 (Cordy, J., concurring).  See generally St. 1993, c. 71.  In enacting this statute, the Legislature declared it a "paramount goal" to provide a public education system of "sufficient quality" to afford all children the opportunity to participate in, and contribute to, the political, social, and economic life of the Commonwealth.  G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.  The Legislature further identified four specific policy goals the Reform Act was intended to ensure:  "(1) that

each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement."  Id.

In furtherance of these purposes, the Reform Act made several changes to the statutory scheme governing teacher dismissals, including shifting from school committees to principals and superintendents the responsibility for dismissing teachers, mandating that teachers' appeals from dismissal decisions proceed directly to arbitration, and providing for limited review of an arbitrator's award, rather than de novo review of the dismissal decision, in Superior Court.  Compare G. L. c.  71, § 42, as amended through St. 1988, c. 153, §§ 4-6, with G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44.

According to the teacher dismissal statute as enacted in 1993, school officials may not dismiss a teacher with

"professional teacher status"[8] except for "inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards . . . or other just cause."  G. L. c. 71, § 42, par. 3.  If a teacher elects to appeal a dismissal decision to an arbitrator, the burden is on the school district to prove that its dismissal decision was based on one of the grounds set forth in the statute.  G. L. c. 71, § 42, par. 5.

The statute further provides the standard by which the arbitrator must review the school district's decision. Specifically, the statute states:  "In determining whether the district has proven grounds for dismissal consistent with this section, the arbitrator shall consider the best interests of the pupils in the district and the need for elevation of performance standards."  Id.

Finally, the statute sets forth the range of remedies an arbitrator may grant to a teacher upon a finding that the

---

[8] Under § 41 of G. L. c. 71, a teacher who has served in the public schools of a school district for the three previous consecutive years is afforded "professional teacher status," and is entitled to the procedural and substantive employment protections set forth in G. L. c. 71, § 42.  Zagaeski was a teacher with professional teacher status at the time of his dismissal.

dismissal decision was "improper under the standards set forth in this section."[9]  G. L. c. 71, § 42, par. 6.

4.  Discussion.  The school committee argues in part that the arbitrator exceeded the scope of authority set forth in the teacher dismissal statute by modifying the punishment imposed by the school district despite having found that the school district carried its burden to show conduct unbecoming a teacher.  The school committee contends that the arbitrator here found that Zagaeski's conduct constituted conduct unbecoming a teacher because it is the facts found and the manner in which they are described by the arbitrator, not the label ascribed to the conduct, that is dispositive.  See Geller, 435 Mass. at 231 (Cordy, J., concurring).  The arbitrator found Zagaeski's conduct to be "obviously . . . inappropriate," in violation of

---

[9] We reject Zagaeski's argument that the remedial language contained in paragraph six of the teacher dismissal statute is the source of the arbitrator's authority.  The provision states in part, "Upon a finding that the dismissal was improper under the standards set forth in this section, the arbitrator may award [equitable remedies]."  Plainly, this is a reference back to the standards by which a school district may dismiss a teacher and according to which an arbitrator must review a decision.  G. L. c. 71, § 42, pars. 3, 5, 6.  This provision does not authorize the arbitrator to alter any disciplinary penalty he or she finds to be "improper" according to the dictionary definition of "improper" and without reference to the substantive standards set forth in paragraphs three and five of the statute.  Furthermore, the range of equitable remedies available enables an arbitrator to make a teacher whole if the school district is found to have failed to carry its burden to show a valid basis for dismissal.  The range of remedies does not imply complete discretion of the arbitrator to impose a different punishment that he or she prefers.

the school district's sexual harassment policy, subjectively offensive, and of the sort to create a "hostile educational environment."  Thus, the arbitrator described the conduct in a manner establishing that Zagaeski's comments constituted conduct unbecoming a teacher even though the arbitrator concluded that the conduct only "nominally" rose to that level.[10]  Id. at 231 & nn.6-7 (Cordy, J., concurring).

The school committee further argues in favor of the interpretation of the statute set forth in Justice Cordy's concurrence in Geller.  See 435 Mass. at 231, 234 (Cordy, J., concurring).  Specifically, the school committee argues that once an arbitrator concludes that the school has proved one of the grounds upon which the statute permits dismissal, the arbitrator is not authorized then to impose a lesser punishment than that selected by the school.  See id.  According to the school committee, footnote seven in Justice Cordy's concurrence could then be understood to mean that only in a circumstance

_____

[10] Prior to the Reform Act, comments alone, without other physical conduct, were recognized as sufficient to constitute "conduct unbecoming a teacher."  See MacKenzie v. School Comm. of Ipswich, 342 Mass. 612, 616 (1961).  Although the Reform Act made significant changes to the teacher dismissal statute, it preserved "conduct unbecoming a teacher" as a permitted ground for dismissal of a teacher.  Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6.  Where the Legislature reenacts statutory language following a judicial interpretation of it, the Legislature is presumed to accept that interpretation.  Boston Hous. Auth. v. Bell, 428 Mass. 108, 110 (1998), and cases cited.

where the conduct at issue is so minor that it does not, in substance, constitute conduct unbecoming a teacher or another enumerated ground permitting dismissal does the arbitrator have the authority to alter the punishment imposed by the school. See id. at 231 n.7 (Cordy, J., concurring). The school committee contends that here, the conduct found by the arbitrator was sufficiently egregious to constitute in substance, not merely in name, conduct unbecoming a teacher. Therefore the arbitrator's decision does not fall into the narrow exception for "nominal" conduct contemplated in Justice Cordy's concurrence in Geller. See id.

Zagaeski argues, however, that the language of the teacher dismissal statute in fact permits an arbitrator to adjust the discipline imposed upon a teacher even after finding that the conduct rises to the level of one of the grounds for which dismissal is permitted by the statute. Specifically, Zagaeski contends that the language of G. L. c. 71, § 42, par. 6, contemplates the adjustment of a disciplinary penalty by the arbitrator in that it states, "Upon a finding that the dismissal was improper under the standards set forth in this section, an arbitrator may award back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof" (emphasis added). G. L. c. 71, § 42, par. 6. Zagaeski argues that the finding that dismissal is "improper" may arise

from the arbitrator's conclusion that the school district failed to carry its burden to show conduct permitting dismissal, or it may arise from the arbitrator's independent conclusion that dismissal was excessive in light of the nature of the misconduct found to have occurred.  Further, Zagaeski argues that the arbitrator cannot have exceeded his authority by considering Zagaeski's past performance as a teacher in determining that his dismissal would not be in the best interest of the students in the district because the dismissal statute mandates that the arbitrator engage in such an inquiry.  G. L. c. 71, § 42, par. 5.

a.  Scope of arbitrator's authority to alter discipline imposed by school district.  The teacher dismissal statute does not grant the arbitrator the discretion to adjust the discipline selected by the school district to the extent Zagaeski maintains.  The purpose of the Reform Act was not to enhance the employment rights of public school teachers.  See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.  Rather, the stated purposes of the Reform Act express a concern for the increased accountability of educators and the improvement of the quality of education provided in public schools.  Id.  Further, the Act eliminated the teacher tenure system, and its reforms to the teacher dismissal statute were intended to "depoliticize and streamline" the teacher dismissal process.  St. 1993, c. 71,

§ 44. 1992 House Doc. No. 5750, at 2 (letter from Governor William Weld accompanying first draft of Reform Act).

To be sure, the Act preserved certain employment protections for public school teachers who achieve professional teacher status, and it replaced the phrase "good cause" with "just cause" in the catchall provision of the teacher dismissal statute. Compare G. L. c. 71, § 42, as amended by St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6. See Geller, 435 Mass. at 233 n.9 (Cordy, J., concurring) (describing use of the phrase "just cause" as ensuring that dismissals under the catchall provision were limited to serious misconduct). However, these changes were intended to serve as a means of furthering the Act's central goal of enhancing the quality of the Commonwealth's public schools, not as an end in themselves. See Atwater, 460 Mass. at 846, 854. The Act affords some measure of employment protection for teachers to enable schools to attract and retain excellent educators while still ensuring that principals and superintendents can act swiftly in making critical staffing decisions in the schools for which they are responsible. See id.; Davis v. School Comm. of Somerville, 307 Mass. 354, 362 (1940) ("Manifestly one of the most important duties involved in the management of a school system is the choosing and keeping of proper and competent teachers"). The Legislature's decision to

shift dismissal decisions to principals and superintendents and away from school committees, combined with the Governor's stated goal of "depoliticizing" the teacher dismissal process, indicates that the statute was intended to ensure that teachers were dismissed only for valid reasons.  However the Legislature did not necessarily intend for arbitrators to have broad discretion to adjust disciplinary decisions based on misconduct that the school had carried its burden to establish.

Our decisions prior to the Reform Act help to shed light on the balance the Act was intended to achieve between empowering school officials to manage the teaching staff effectively while providing some measure of protection to professional status teachers.  Specifically, cases prior to the Reform Act expressed concern over teacher dismissal decisions by school committees that were based on "personal hostility, ill will or political animosity" such that the school's stated grounds for dismissal were nothing more than pretext.  MacKenzie v. School Comm. of Ipswich, 342 Mass. 612, 619 (1961).  See Kelley v. School Comm. of Watertown, 330 Mass. 150, 151 (1953) (reorganization of school administration was "subterfuge" and undertaken in bad faith to enable school committee to demote and replace petitioner); Sweeney v. School Comm. of Revere, 249 Mass. 525, 529-530 (1924) (school committee voted to eliminate position of

principal not on good faith need to conserve resources but due to disagreement with principal's political views).

Similar concerns animate footnote seven in Justice Cordy's concurring opinion in Geller, 435 Mass. at 231 n.7. Justice Cordy concluded that the teacher dismissal statute does not permit an arbitrator to override a school district's decision to dismiss a teacher if the arbitrator finds that the school has proved conduct amounting to one of the grounds permitting dismissal. Id. at 231. However, Justice Cordy acknowledged that at the same time, the statute would permit an arbitrator to override a school district's dismissal decision if the misconduct in issue is so minor that it does not, in substance, constitute the sort of misconduct for which the statute permits dismissal. Id. at 231 n.7.

Consequently, if an arbitrator finds that the school district has labeled a teacher's conduct "conduct unbecoming a teacher" when the conduct does not, in substance, truly rise to that level, or that the school district has used that label merely as a pretext to dismiss the teacher based on personal, political, or other unauthorized bases, the arbitrator is empowered to vacate the punishment imposed by the school district. Thus, the statutory directive requiring arbitrators to consider the best interests of the pupils and the need to elevate performance standards in reviewing whether the school

district carried its burden to show conduct permitting dismissal is intended in part to prevent politically motivated dismissal decisions. Indeed, the standards governing the arbitrator's review are likely intended to serve as a direct reminder to the arbitrator of the purposes underlying the Reform Act and the proper considerations for a school district to undertake in its dismissal decisions. See Geller, 435 Mass. at 235.

In this case, however, there is no indication in the record before us that the grounds on which Zagaeski was dismissed were mere pretext or that his misconduct was so minor that it did not in substance constitute one of the enumerated bases on which the statute permits dismissal. Therefore, Justice Cordy's observation in footnote seven in Geller regarding "minor" misconduct, and the concerns expressed in early case law regarding political dismissals based on "subterfuge," are not implicated here.

Public school teachers hold a position of special public trust. Perryman v. School Comm. of Boston, 17 Mass. App. Ct. 346, 349 (1983) ("There are certain forms of employment which carry a position of trust so peculiar to the office and so beyond that imposed by all public service that conduct consistent with this special trust is an obligation of the employment"). Dupree v. School Comm. of Boston, 15 Mass. App. Ct. 535, 538 (1983). They are responsible for more than

teaching basic academic skills.  See Geller, 435 Mass. at 238-239 (Ireland, J., concurring in the result) ("a teacher's responsibilities include the maintenance of a safe environment that is conducive to . . . students' growth").  As we recently acknowledged, "[s]tudents must be able to trust that they will be safe in the presence of their teachers and coaches.  They must be able to rely on their teachers and coaches to exercise sound judgment and maintain appropriate boundaries, even when they themselves may be unable to do so."  Atwater, 460 Mass. at 852 (quoting underlying arbitration award).  The creation of a hostile learning environment through sexual harassment, whether verbal or physical, can be detrimental to the well-being of students who experience such harassment in part because it may unreasonably interfere with their education.  See G. L. c. 151C, § 1 (e).  Moreover, citizens of this Commonwealth, including public school students, have a constitutional right to be free from gender-based discrimination, which includes certain forms of sexual harassment.  Art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution.  O'Connell v. Chasdi, 400 Mass. 686, 693 (1987) (concluding that sexual harassment can violate rights secured under art. 1).  Numerous statutory enactments also make clear the importance of protecting children from sexual harassment in school.  See G. L. c. 151C, § 2 (g) (sexual

harassment of student in any program or course of study in educational institution is unfair educational practice); G. L. c. 214, § 1C (granting right to be free from sexual harassment as defined in G. L. cc. 151B and 151C); 603 Code Mass. Regs. § 26.07(2) (requiring public schools to strive to prevent sexual harassment and to respond promptly to reports of its occurrence).  Zagaeski's conduct undermined these policies, as well as one of the central purposes of the Reform Act:  to ensure an educational setting that safeguards, rather than warps, a child's self-esteem.  See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.

Of additional concern, teachers are in part responsible for instilling core constitutional values in students in preparation for their participation as citizens in a democracy.  See Dupree, 15 Mass. App. Ct. at 539.  A teacher who models sexually harassing behavior in front of public school students as if it is all in good fun undercuts our constitutional value of freedom from gender discrimination.  See O'Connell, 400 Mass. at 693. Indeed, students who witness a teacher engage in such conduct may come to believe that such conduct is acceptable in an academic or professional setting.  See Dupree, supra at 538, quoting Faxon v. School Comm. of Boston, 331 Mass. 531, 534 (1954) ("As role models for our children [teachers] have an 'extensive and peculiar opportunity to impress [their] attitude

and views' upon their pupils"). Inculcation of those sorts of values by teachers is not acceptable in our public schools.

The Reform Act specifically vested in principals the power to dismiss teachers, subject to review and approval by superintendents, in order to raise the accountability of school officials for the success of their schools. See St. 1993, c. 71, § 44. See also Pittsfield, 438 Mass. at 760; Higher Educ. Coordinating Council/Roxbury Community College v. Massachusetts Teachers' Ass'n/Mass. Community College Council, 423 Mass. 23, 29 n.6 (1996); 1992 House Doc. No. 5750, at 2. We have long-recognized decisions regarding teacher employment as central to effective school management. See Higher Educ. Coord. Council, supra at 28-29; School Comm. of W. Springfield v. Korbut, 373 Mass. 788, 794-795 (1977); Davis, 307 Mass. at 362. Although undoubtedly a difficult decision, the superintendent undertook a thorough investigation, determined that Zagaeski engaged in conduct unbecoming a teacher, and dismissed him on that ground. This determination was within the superintendent's statutory authority and was not unwarranted in light of the broader implications of Zagaeski's conduct and the purposes underlying the Reform Act. See G. L. c. 69, § 1; G. L. c. 71, § 42.

b. Best interests of the pupils in the district and the need to elevate performance standards. We further acknowledge

that the teacher dismissal statute does authorize the arbitrator to engage in a substantive review of dismissal decisions insofar as it requires arbitrators to consider the "best interests of the pupils in the district and the need for elevation of performance standards."  See G. L. c. 71, § 42, par. 5.  To conclude otherwise would render the statutory mandate that the arbitrator undertake these considerations effectively meaningless.  See Geller, 435 Mass. at 242-243 (Cowin, J., dissenting).  However, we disagree that this statutory language authorizes an arbitrator to draw on a teacher's past performance to override a dismissal decision based on a teacher's conduct having threatened the safety and welfare of his or her students.  If a teacher's past performance could be used as a basis on which an arbitrator could award reinstatement -- because, as here, the arbitrator concluded it was in the students' best interests to have high performing teachers -- then the "need for elevation of performance standards" and the "best interests of the pupils" would come to mean the same thing.  However, the statute should not be construed to render one of the two standards governing the arbitrator's review as redundant of the other.  School Comm. of Brockton v. Teachers' Retirement Bd., 393 Mass. 256, 262 (1984), quoting 2A C. Sands, Sutherland Statutory Construction § 46.06 (4th ed. 1973) ("[A] statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous").

The distinct meanings of these two standards can be ascertained by reference to the other provisions of the teacher dismissal statute and the stated purposes of the Reform Act. See Saccone v. State Ethics Comm'n, 395 Mass. 326, 334-335 (1985) (statutes should be construed to constitute "harmonious whole"; otherwise their purpose may be defeated [citation omitted]). When the Legislature enacted the Reform Act, it identified the importance of safeguarding students' "sense of security or self-esteem" in the classroom as distinct from, though equally as important as, the establishment and achievement of specific educational performance goals. G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27. This distinction between safety and well-being on one side and academic achievement on the other is also mirrored in the enumerated grounds on which a school district may dismiss a professional status teacher. In one category, a school district may dismiss a teacher for performance-based reasons including "inefficiency," "incompetency," or failure to satisfy performance standards. G. L. c. 71, § 42, par. 3. In the other category, a school district may dismiss a teacher for conduct that jeopardizes the well-being of students or the proper functioning of the school community, including "conduct

unbecoming a teacher," "insubordination," or "incapacity." Id.
Therefore, the standards by which the arbitrator must review a
dismissal decision should be construed in light of this same
distinction.

Where the teacher conduct in issue is performance-based,
the arbitrator should consider the school district's decision
primarily in light of the need to raise performance standards.
However, when the conduct in issue has jeopardized the safety or
self-esteem of students in the classroom setting, the arbitrator
should consider the best interests of the pupils primarily in
light of the pupils' interest in a safe learning environment.
Here, the arbitrator permitted the pupils' interest in the
academic success of their school to override their interest in a
safe, supportive classroom environment. This determination was
in excess of the arbitrator's authority because it had the
effect of nullifying one of the stated purposes of the Reform
Act. The Legislature cannot have intended a teacher's past
academic performance to be used to justify reinstatement of a
teacher found to have engaged in conduct that created a hostile
learning environment for certain students. See Commonwealth v.
Parent, 465 Mass. 395, 409 (2013) (statutes may not be
interpreted so as to yield absurd results). Despite Zagaeski's
apparent success as a classroom teacher, that "track record"
should not be used to conclude that it is in the "best

interests" of students to reinstate a teacher who was found to have violated the school's sexual harassment policy.[11]  By awarding reinstatement of Zagaeski based on an interpretation of the "best interests of the pupils" to mean the same thing as "the need to elevate performance standards," the arbitrator's award overrode the superintendent's decision on an unauthorized basis and runs contrary to the core purposes of the Reform Act and the high standards of conduct the public expects from its teachers.

---

[11] Although a teacher's length of service and past performance may be considered as factors mitigating against dismissal under the rubric of "just cause" in collective bargaining agreements, and the Reform Act replaced the phrase "good cause" with "just cause" as an enumerated basis on which a teacher may be dismissed, the teacher dismissal statute does not permit an arbitrator to engraft an additional just cause analysis onto each of the grounds enumerated in the statute on which dismissal may be based.  See St. 1993, c. 71, § 44.  See also School Dist. of Beverly v. Geller, 435 Mass. 223, 231, 233 & n.9 (2001) (Cordy, J., concurring).  A plain reading of the teacher dismissal statute makes clear that a school district may dismiss a teacher for any of the enumerated bases "or other just cause" (emphasis added).  G. L. c. 71, § 42.  Therefore, the statute implies that dismissal based on any of the enumerated grounds would be just cause, and "other just cause" stands alone as an additional ground upon which dismissal may be based.  The phrase "other just cause" does not permit a reduction in the penalty imposed for conduct constituting one of the other enumerated grounds.  See Geller, supra at 232-233 & n.9 (Cordy, J., concurring).  This interpretation of the statute comports with a long history of judicial interpretation of similarly worded provisions in collective bargaining agreements.  Id. at 232 & n.8 (Cordy, J., concurring), and cases cited.  Consequently, the fact that the Reform Act replaced "other good cause" with "other just cause" as a basis for dismissal, without further change to the text of the provision, is not sufficient to indicate a legislative intent to import an additional just cause analysis into the other grounds permitting dismissal.

5. <u>Conclusion</u>.  For the foregoing reasons, the order of the Superior Court confirming the arbitrator's award is vacated, and the case is remanded to the Superior Court for entry of an order vacating the arbitration award.

<u>So ordered</u>.

LENK, J. (dissenting). The arbitrator's decision, fairly read, reflects his conclusion that the plaintiff, the school committee of Lexington, did not carry its burden of proving that the defendant, Mark Zagaeski, engaged in the serious misconduct necessary to establish "conduct unbecoming a teacher," one of six enumerated grounds on which a teacher with professional status can be dismissed under G. L. c. 71, § 42. Instead, based on all of the evidence adduced at the arbitration hearing, he determined that Zagaeski's isolated episode of inappropriate behavior, while fitting nominally within that statutory category, was only minor in nature. This was a determination well within the scope of the arbitrator's authority. Hence, I respectfully dissent, parting company as I do with the court's independent assessment of the facts as found, its determination that the conduct at issue could not be deemed anything other than the requisite serious misconduct warranting dismissal, and its conclusion that, by reinstating Zagaeski, the arbitrator exceeded the scope of his authority. To the extent that the arbitrator imposed alternative discipline upon Zagaeski, however, I agree that he exceeded the scope of his authority. While the school authorities did not satisfy the statutory requirements when dismissing Zagaeski, it is solely within their purview whether other discipline instead should be imposed. I

would accordingly remand the matter.  See School Dist. of
Beverly v. Geller, 435 Mass. 223, 224 (2001) (Geller).

1.  Statutory framework.  General Laws c. 71, § 42,
delineates the circumstances under which teachers who have
attained professional status can be dismissed, as well as the
scope of arbitrators' review of such dismissals.  Three
paragraphs of the statute are particularly relevant here.  I
begin with an analysis of these paragraphs, informed by the
somewhat unsettled case law construing them, including both
Justice Cordy's concurring opinion and Justice Cowin's
dissenting opinion in Geller, supra.[1]  See Atwater v.
Commissioner of Educ., 460 Mass. 844, 858 n.11 (2011).

General Laws c. 71, § 42, third par., enumerates six
grounds on which a teacher with professional status may be
dismissed:  inefficiency, incompetency, incapacity, conduct
unbecoming a teacher, insubordination, failure to satisfy
performance standards, "or other just cause."  General Laws
c. 71, § 42, fifth par., allocates to the district the burden of
proving one of these grounds, and provides that, "[i]n
determining whether the district has proven grounds for

---

[1] No opinion in School Dist. of Beverly v. Geller, 435 Mass.
223 (2001) (Geller), garnered a majority.  Justice Cordy
authored a concurring opinion, with whom Chief Justice Marshall
and Justice Sosman joined.  Justice Ireland wrote a separate
opinion, concurring in the result, with which Justice Cordy also
joined.  Justice Cowin dissented, and was joined by Justice
Greaney and Justice Spina.

dismissal . . . , the arbitrator shall consider the best interests of the pupils in the district and the need for elevation of performance standards."

If, in making such a determination, the arbitrator concludes that the district failed to carry its burden of proving an enumerated ground for dismissal, thereby rendering the dismissal "improper under the standards set forth in [G. L. c. 71, § 42,]" the sixth paragraph of the statute authorizes the arbitrator to award certain remedies to the teacher, namely, "back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof."[2]

As the court recognizes, the question regarding an arbitrator's authority to reinstate a teacher who has been found to have engaged in conduct only nominally constituting an enumerated ground for dismissal remains unresolved after Geller, supra. This reflects in no small measure the deep division in the Geller court as to the arbitrator's proper role, represented by Justice Cordy's and Justice Cowin's opposing opinions. Although neither opinion is entirely consonant with my own view of the statute, both recognize, as I do, that the school district does not satisfy its burden of proving the propriety of the discipline imposed simply by showing facts that could

---

[2] The arbitrator may not, however, award "punitive, consequential, or nominal damages, or compensatory damages other than back pay, benefits or reinstatement." G. L. c. 71, § 42, sixth par.

conceivably amount to an enumerated ground for dismissal, without regard to the gravity of the act said to have occurred. Rather, under both Justice Cordy's and Justice Cowin's interpretations of the statute, the arbitrator is assigned the duty to determine whether the facts adduced in fact establish "serious misconduct" warranting dismissal on an enumerated ground. See Geller, supra at 231 n.7 (Cordy, J., concurring); Geller, supra at 241 (Cowin, J., dissenting). In other words, not all conduct that a school district may see fit to characterize as constituting an enumerated ground for dismissal will in fact rise to the level of serious misconduct that the Legislature envisioned would justify terminating a teacher who has attained professional status. It is the statutorily appointed role of the arbitrator to determine whether proven conduct does indeed rise to that level.

Indeed, that only "serious misconduct" will constitute an enumerated ground for dismissal is implied by the Legislature's insertion, in the 1993 amendment, of a new category of "other just cause," and its simultaneous deletion of "other good cause" as a ground for dismissal. See St. 1993, c. 71, § 44. As Justice Cordy observed in Geller, supra at 233 n.9, "[i]t is reasonable . . . to conclude from the substitution of the word 'just' for 'good' that the Legislature intended to limit the broad range of conduct that had previously been considered as

warranting dismissal in this catchall category, to serious misconduct."[3]

According to Justice Cordy's view, however, once an arbitrator determines that a school district has proved "serious misconduct" amounting to an enumerated ground for dismissal, "the arbitrator does not have the authority to judge whether discharge is an excessive penalty for the violation committed." Id. at 232 (Cordy, J., concurring). The arbitrator is "preclude[d] . . . from conducting a further 'just cause' analysis (e.g., weighing the teacher's prior record against the misconduct for the purpose of justifying a different sanction)

---

[3] Although the court asserts that the purpose of the Education Reform Act of 1993 (Reform Act), which amended G. L. c. 71, § 42, was not to enhance the employment rights of public school teachers, ante at   , there is also nothing to suggest that the amendment was intended to diminish the rights of teachers with professional status. If anything, insofar as the shift from a "good cause" to a "just cause" standard imposed a higher burden on schools, the Reform Act in fact provided greater protection to teachers with professional status, by limiting the circumstances under which they could be dismissed. See Geller, supra at 233 n.9 (Cordy, J., concurring), and cases cited (explaining that "good cause" had been understood to mean "any ground which is put forward [by the supervising authority] in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the . . . task of building up and maintaining an efficient school system," whereas "just cause" suggests "substantial misconduct which adversely affects the public interest" [citations omitted]). Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6.

Due regard for employment rights is hardly at odds with the stated purposes of the Reform Act to which the court refers, namely, to increase the accountability of educators and to improve the quality of education provided in public schools. See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.

once he has found that one of the enumerated grounds for dismissal has been proved." Id. at 234.

Justice Cowin, on the other hand, would have concluded that the statute authorizes an arbitrator to determine "both whether the grounds [for dismissal] alleged by the school district have occurred and, if so, whether such grounds warrant dismissal." Id. at 241 (Cowin, J., dissenting). According to Justice Cowin, assessing whether the proven grounds warrant dismissal, or merely a less severe penalty, is not only within the arbitrator's discretion, but required by the statutory directive that arbitrators consider "the best interests of the pupils in the district and the need for elevation of performance standards." See G. L. c. 71, § 42, fifth par.; Geller, supra at 242-243 & n.2 (Cowin, J., dissenting).

I agree with Justice Cowin that G. L. c. 71, § 42, authorizes an arbitrator to assess whether the facts found warrant dismissal. In my view, it is within the scope of an arbitrator's authority to determine both whether the conduct alleged by the school district in fact occurred, and, if it did, to decide whether such conduct "r[o]se to the level of [serious] misconduct contemplated by the statute as a ground for dismissal." Geller, supra at 231 n.7 (Cordy, J., concurring). In performing the latter task of determining whether the district has proved grounds for dismissal, the statute requires

the arbitrator to take into account "the best interests of the pupils in the district and the need for elevation of performance standards."  G. L. c. 71, § 42, fifth par.

The Legislature has provided for meaningful review by accredited professional arbitrators, see G. L. c. 71, § 42, fourth par., of decisions made by school authorities to terminate teachers with professional status.  This review is to assure that such decisions are based only on the serious misconduct that the statute details and, of necessity, encompasses both a determination of what occurred and a contextualized assessment of its gravity.  The credentialed arbitrator is thus tasked not only with finding facts, but also with weighing those facts in conjunction with the mandatory student-interest and performance criteria, see G. L. c. 71, § 42, fifth par., to ascertain whether dismissal is warranted. An arbitrator who does this, and concludes that dismissal was not in fact substantiated, does not thereby overstep his bounds and usurp the role of school authorities.  Rather, in so doing, the arbitrator fulfills his or her statutorily mandated duty of discerning whether the district sustained its burden of proving an enumerated ground for dismissal.[4]

---

[4] Of course, there may be situations in which an arbitrator's reinstatement of a teacher, after finding that the school district had not sustained its burden, would violate public policy, an independent ground to vacate an arbitrator's award.  See Massachusetts Highway Dep't v. American Fed'n of

Unlike Justice Cowin, however, I do not believe that the statute empowers arbitrators to impose alternative penalties on teachers, short of dismissal, that the arbitrator perceives to be more proportional to the severity of the misconduct he or she determined to have occurred. The sixth paragraph of the statute sets out the actions that arbitrators are authorized to take if they conclude that dismissal was "improper." Those actions are remedial in nature, and are limited to awarding "back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof"; the statute makes no express provision for the exercise of an arbitrator's own judgment in choosing an ostensibly fair punishment. See G. L. c. 71, § 42, sixth par. The statute thus contemplates that an arbitration hearing will have one of two outcomes: either the arbitrator will determine that the district carried its burden, upholding its dismissal decision, or the arbitrator will find that the district did not carry its burden, reversing the district's decision and awarding the teacher some form of relief. Should the school district's dismissal decision be reversed, it remains solely within the purview of the district to determine whether

_____

State, County & Mun. Employees, Council 93, 420 Mass. 13, 16-19 (1995). The court does not rely on public policy grounds here, and indeed, "[n]o public policy requires that a teacher be fired in these circumstances." Geller, supra at 247 (Cowin, J., dissenting).

other discipline should then be imposed.  See G. L. c. 71, § 42D.

In sum, I believe that it is the proper function of the arbitrator to find and weigh the facts, and subsequently either to reverse or to uphold a school district's dismissal decision, but not to reduce the punishment imposed by the school.  I now turn to a discussion whether the arbitrator here acted within the scope of his authority.

2.  <u>Arbitrator's finding that Zagaeski committed "nominal" misconduct</u>.  In substantial reliance on footnote 7 of Justice Cordy's concurring opinion in <u>Geller</u>, <u>supra</u>, the arbitrator found, based on the undisputed facts,[5] that the school district did not meet its burden of proving an enumerated ground for dismissal.  Footnote 7 states,

> "We note that the arbitrator found [the teacher's] actions to constitute serious misconduct ('totally inappropriate,' 'unacceptable,' which

---

[5] Zagaeski was the only witness at the arbitration hearing; neither the seventeen year old female student who brought Zagaeski's comments to the school's attention nor other witnesses with firsthand knowledge of the underlying events testified.  In addition to Zagaeski's uncontradicted testimony (which "provided important context regarding what was going on and being said immediately before, during, and after he made the comments in question to the [seventeen] year old student,") the arbitrator had before him a letter that Zagaeski had written during the investigation to the assistant superintendent as well as other statements he and his counsel made to the district's representatives during that period.  The arbitrator stated, "To meet its burden of persuasion, the school district in this proceeding has relied entirely upon what it asserts are facts as admitted to by Dr. Zagaeski himself."

'cannot be condoned'), a finding consistent with the evidence adduced at the arbitration hearing.  This is not the case of an arbitrator finding a teacher to have engaged in minor misconduct that, however, nominally fit within a category on which dismissal could be based.  In such circumstances, an arbitrator's finding that the conduct did not rise to the level of misconduct contemplated by the statute as a ground for dismissal is one that would likely lie within the scope of his authority."

Geller, supra at 231 n.7 (Cordy, J., concurring).  The arbitrator quoted this footnote in its entirety and used it to frame his discussion of the import of Zagaeski's comments.  At the outset of his opinion, the arbitrator set forth a standard of review that incorporated language from this footnote, noting that both parties' briefs cited that standard as governing the matter before him.[6]

The arbitrator began his analysis by noting, rightly, that Zagaeski's comments to the student regarding trading sexual

---

[6] Although "the parties [cannot] properly authorize the arbitrator to act beyond his statutory authority in any event," Geller, supra at 230 n.5 (Cordy, J., concurring), the standard of review that the arbitrator set forth nonetheless sheds light on the manner in which he undertook to analyze the facts at hand.  According to that standard,

"[I]f the arbitrator finds that the school district has proven one of the six specifically listed grounds for dismissal, and has proven that the misconduct was serious rather than only minor in nature, then the arbitrator must uphold the termination decision, unless the arbitrator makes specific and detailed findings that the 'best interest of the pupils in the district . . .' warrant the retention of the teacher notwithstanding the serious misconduct which has occurred."  (Emphasis supplied.)

favors for grades "obviously were inappropriate if taken literally" and were inconsistent with the school district's policy against sexual harassment.  And, indeed, it goes without saying that any insinuation that good grades are available for barter, particularly in exchange for sexual favors, would be wholly improper and have no place in the classroom.

But the arbitrator went on to make nuanced findings that situated the exchange within the context of the "obviously absurd joke" that the student had made to Zagaeski several days before about paying him for a better grade, and another student's comment about sexual favors, to which Zagaeski had responded, "Don't be ridiculous."  When the student again reiterated her "ridiculous request" a couple days later, Zagaeski "responded with a joking comment of his own," as a way of referring to the recent exchange, something he considered to be "like an inside joke" with the student.

Given the jesting context in which the remarks were made, Zagaeski's lack of actual intent to solicit sexual favors from the student, and the one-time nature of his behavior, the arbitrator determined that Zagaeski's words essentially amounted to "one ill-advised set of interrelated, joking comments, made in response to ill-advised jokes initiated by his students," and therefore only "nominally" fit within the category of conduct unbecoming a teacher.  However, the arbitrator did not, as the

court states, conclude that the school district had carried its burden of establishing one of the six enumerated grounds for dismissal. To the contrary, the arbitrator concluded that, "[g]iven the relatively minor, and isolated character of Dr. Zagaeski's misconduct, and his proven excellence as a teacher over the course of his decade of work in the Lexington Public Schools, the district has not proven grounds for dismissal . . ." (emphasis supplied). As the Superior Court judge observed, "[t]he arbitrator's findings regarding Zagaeski's conduct appear to fit precisely within the scenario set out by Justice Cordy in footnote 7 of [Geller, supra]."[7]

The court acknowledges that this question, regarding an arbitrator's authority to reinstate a teacher after finding that he committed only nominal misconduct, was left open by Geller, supra, but does not provide a direct answer. It instead engages in its own assessment of the facts and concludes that, notwithstanding the arbitrator's determination that Zagaeski engaged in only nominal and isolated misconduct, it is not

---

[7] Even if the arbitrator misapprehended the holding of Geller, supra, his interpretation -- which the Superior Court judge tracked -- was a reasonable one, particularly given the fractured nature of the court's opinion in that case. And even assuming that his interpretation was erroneous, "[a]bsent proof of one of the grounds specified in G. L. c. 150C, § 11 (a), a reviewing court is 'strictly bound by the arbitrator's factual findings and conclusions of law, even if they are in error.'" Atwater v. Commissioner of Educ., 460 Mass. 844, 848 (2011), quoting School Comm. of Lowell v. Robishaw, 456 Mass. 653, 660 (2010).

possible that the conduct at issue was anything other than serious, and, as such, the arbitrator acted outside of his authority in "adjusting" the school's disciplinary decision. In so doing, the court inappropriately substitutes its own judgment for that of the arbitrator.

The court appears to share the school committee's conviction that Zagaeski's very utterance of the words to the student itself suffices to establish serious misconduct. But words alone are only a piece of human communication. Words shorn of context, taken only literally, are at a far remove from language embedded in circumstance. In any attempt to understand an event after the fact, establishing who said what generally will only begin to reveal what actually happened. Indeed, determining what actually happened, and the gravity of what actually happened, is precisely what this arbitrator was called upon to do and did. It is not for us to substitute our view for his.

Given my view that the statute authorizes the arbitrator to assess whether the facts as found warrant dismissal, and keeping in mind the "well-settled principle of law that arbitration awards are subject to a narrow scope of review," School Comm. of Chicopee v. Chicopee Educ. Ass'n, 80 Mass. App. Ct. 357, 364 (2011), I cannot accept the court's analysis or conclusion in

this regard.[8]  I would instead squarely hold that where, as here,

an arbitrator determines that the misconduct at issue was of a

minor or nominal nature and, as such, did not constitute the

serious misconduct necessary to satisfy an enumerated ground for

dismissal, he acts well within the scope of his authority when

concluding that the district has not sustained its burden of

---

[8] Although arbitrators' factual findings are "not open for
our review," School Comm. of Lowell v. Robishaw, supra at 664,
the arbitrator's determination here that Zagaeski's isolated
instance of improper joking with a student constituted minor
misconduct, only nominally "conduct unbecoming a teacher," is,
in any event, supported by the record, particularly when
compared to conduct that has been deemed to fit the rubric of
conduct unbecoming a teacher in other cases.  For example, in
Atwater v. Commissioner of Educ., supra at 849-850, the
arbitrator found that the teacher invited a student to his house
and while there, "inappropriately touched [her], touching her
back, reaching down her shirt, and touching her buttocks in a
sexual manner as well as hugging the student in an attempt to
restrain her from leaving."  In addition, the teacher "made
numerous attempts" to contact the student via electronic mail
and telephone, through her friends, and by following her vehicle
and visiting her home, which the arbitrator labeled "serious"
misconduct.  Id. at 850, 852.

    Similarly, in Geller, supra at 226-227 & n.3, the
arbitrator found that the teacher, who had received a warning
from school authorities prior to his dismissal, engaged in
"unacceptable" conduct over the course of seven months,
culminating in three separate incidents involving the use of
physical force against students.  Quite unlike here, the
arbitrator in that case "found facts and described those facts
in a manner that clearly establishe[d the teacher's] conduct to
be 'conduct unbecoming a teacher.'"  Id. at 231.

    Thus, both these cases involved a pattern of serious
misconduct over a prolonged period of time, distinguishable from
the isolated and quite dissimilar nature of the misconduct at
issue in this case.

proving grounds for dismissal.  See G. L. c. 71, § 42, fifth par.

Far from an arbitrary substitution of the arbitrator's own judgment for that of the school district, such a determination amounts to a conclusion that the dismissal was "improper," as per G. L. c. 71, § 42, sixth par.  Upon such a finding of impropriety, the arbitrator is empowered to "award back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof."  G. L. c. 71, § 42, sixth par.  Thus, I believe that the arbitrator here did not exceed his authority in reinstating Zagaeski, particularly in light of his clear reliance on footnote 7 of Justice Cordy's concurrence in Geller, supra, which essentially provided a roadmap for his decision.  I would therefore leave intact the reinstatement award here.[9]

3.  Arbitrator's consideration of "best interests of the pupils in the district and the need to elevate performance standards".  General Laws c. 71, § 42, fifth par., instructs arbitrators to "consider the best interests of the pupils in the

_____

[9] Whether the arbitrator exceeded his authority in reinstating Zagaeski is the central issue that the parties dispute in the case, and, as I have explained, I would hold that he did not.  Because, however, as discussed supra, I do not believe that the statute empowers arbitrators to impose alternative discipline short of dismissal, I would hold that the arbitrator lacked authority to order two days of unpaid suspension, and remand to the Superior Court for entry of an order that the arbitrator's decision be revised accordingly.

district and the need for elevation of performance standards" in determining whether the school district has proved grounds for dismissal. The court decouples this consideration into two separate criteria, applicable to different enumerated grounds for dismissal, in a manner that I believe is not supported by the statutory language and will prove unworkable in practice.

The court breaks the six enumerated grounds warranting dismissal, set forth in G. L. c. 71, § 42, third par., into two categories of misconduct, namely, "performance-based" misconduct on the one hand, and misconduct that "jeopardize[s] the safety or self-esteem of students in the classroom setting" on the other. Ante at . The category of misconduct at issue, the court holds, determines whether the arbitrator is to consider "the need to raise performance standards," or "the best interests of the pupils primarily in light of the pupils' interest in a safe learning environment" in determining whether the school district has proved grounds for dismissal. Ante at . The court concludes that the arbitrator here exceeded his authority by applying the former criterion, where the conduct at issue fell into a category demanding application of the latter.

By dividing the six enumerated grounds into two classes of misconduct, the court creates an artificial distinction that is not borne out by the statute. The statute simply enumerates the grounds warranting dismissal in one unbroken list, and provides

generally that "the arbitrator shall consider the best interests of the pupils in the district and the need for elevation of performance standards." See G. L. c. 71, § 42, third & fifth pars. It does not direct arbitrators to cabin their consideration of these factors depending on the type of misconduct determined to have occurred.

Moreover, it is far from clear that, in practice, "performance-based" conduct is readily distinguishable from misconduct that "has jeopardized the safety or self-esteem of students in the classroom setting." Neither is it evident that misconduct grouped in the latter category, including misconduct bearing the somewhat indeterminate label of "conduct unbecoming a teacher," will in fact jeopardize students in such a manner.[10]

---

[10] Indeed, it is difficult to see how the conduct at issue in MacKenzie v. School Comm. of Ipswich, 342 Mass. 612, 616 (1961), which the court cites, ante at  -- a teacher's muttering the words "son of a bitch" to the superintendent at a meeting of school personnel -- "jeopardized the safety or self-esteem of students in the classroom setting." In cases such as MacKenzie v. School Comm. of Ipswich, supra, it is not clear whether the court's formulation directs arbitrators to consider "the need to raise performance standards" or "the best interests of the pupils primarily in light of the pupils' interest in a safe learning environment."

In any event, MacKenzie v. School Comm. of Ipswich, supra, was decided prior to the Legislature's enactment of the Reform Act in 1993, which amended the statutory scheme governing the dismissal of teachers. See St. 1993, c. 71, § 44. Under the old version of the statute, teacher dismissal was measured against a "good cause" standard, rather than the "just cause" benchmark that currently prevails. Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6. The court cites

In any event, the court's conclusion that the arbitrator here put undue weight on "the pupils' interest in the academic success of their school" simply misconstrues the arbitrator's findings. Ante at . As an initial matter, the arbitrator's weighing of the mandatory student-interest and performance criteria was not necessary to his decision, as he found that the school district had not sustained its burden of proving an enumerated ground for dismissal because the misconduct at issue was minor, not serious. After so finding, the arbitrator went on to state that, "[e]ven if Dr. Zagaeski's words toward [the student] were characterized as serious rather than a minor act of conduct unbecoming a teacher (which is not the view of this arbitrator), . . . the district has not proven grounds for dismissal because the best interests of the pupils in the district and the need for elevation of performance standards warrant the retention of Dr. Zagaeski."

Instead of "permitt[ing] the pupils' interest in the academic success of their school to override their interest in a safe, supportive classroom environment," as the court suggests,

this case as providing an example of "conduct unbecoming a teacher" that has persisted through the amendment. Ante at . To my mind, however, the question whether the conduct at issue in the pre-amendment case of MacKenzie v. School Comm. of Ipswich, supra, would constitute "just cause" for dismissal under the amended version of G. L. c. 71, § 42, is not free from doubt. See Geller, supra at 233 n.9 (Cordy, J., concurring) (Legislature's substitution of "just cause" for "good cause" demonstrates intent to restrict conduct justifying dismissal to "serious misconduct").

the arbitrator properly treated the statutory criteria as interconnected. The arbitrator noted the "rapport" that Zagaeski had developed with his students over the course of the school year, as well as the atmosphere of "mutual respect" that he had cultivated in his classroom, in part through the use of humor and a less hierarchical approach to teaching. Zagaeski "tried to create a culture of comfort in which the students would feel safe and at ease" and "developed a teaching style designed to meet the students at the level they understood, in an environment that made them comfortable and helped them to achieve academically." This teaching style contributed to Zagaeski's "record of impressive accomplishment in helping a relatively challenged group of students to achieve success."

Therefore, in light of Zagaeski's "proven excellence as a teacher over the course of his decade of work in the Lexington Public Schools," the arbitrator concluded that "the best interests of the pupils and the need for elevation of performance standards warrant the retention of Dr. Zagaeski." In so doing, the arbitrator acted within his authority by considering in an integrated manner the two factors that G. L. c. 71, § 42, fifth par., mandates be taken into account.

In sum, I would hold that the arbitrator was authorized to conclude, as he did, that Zagaeski had not engaged in the serious misconduct necessary in the first instance to establish

the statutory ground of conduct unbecoming to a teacher, that consideration of the mandatory best-interest and performance factors led to the same result, and that the school district had therefore failed to carry its burden of proving a ground warranting dismissal.  For these reasons, I respectfully dissent.